## COLE and THURMAN v. WHITE.

A *mortgage of goods and chattels*, though unaccompanied by an immediate delivery and not followed by an *actual* and *continued change of possession* of the thing mortgaged, is *not void* if it be made to appear on the part of the mortgagee, that the same was made in *good faith* and *without any intent to defraud purchasers or creditors*.

The *want of change of possession* subjects the instrument *prima facie* to the imputation of fraud, but such imputation may be rebutted by proof of *good faith;* the testimony to be received, *it seems,* will be governed by the general rules of evidence applicable to questions in which it is the province of a jury to pass upon the *intent* of parties, and that *all proof* tending to satisfy the understanding or the conscience of the jury as to the *bona fides* of the transaction, *not inconsistent with the general law of evidence,* is admissible.

Where in the case of a mortgage of the moiety of a schooner not in port, of which delivery was not made until several months after the execution of the instrument, and not until after the forfeiture of the mortgage, although the vessel returned to port and possession might have been delivered in the meantime, the judge *excluded from the consideration of the jury* facts which had been proved, viz: that the mortgage was founded upon a fair and adequate consideration; that it was duly filed; that the other moiety was owned by third persons; and that the vessel was sailed on joint account of the owners until a few days previous to the delivery: IT WAS HELD that the judge had erred in so doing, and a new trial was accordingly granted.

A mortgage of a vessel (navigating the lakes) in the usual form of personal mortgages to secure the payment of a debt, and containing none of the characteristics of a contract of *bottomry,* is not within the exception to § 5 of the *act relative to fraudulent conveyances* as specified in § 7, of the same statute, saving contracts of *bottomry* from the operation of § 5; nor is it within the exception in the same section saving assignments or hypothecations of vessels *at sea,* or in *foreign ports*: the fresh water lakes of this country not being *seas* within judicial interpretation, nor the port of a sister state a *foreign port*.

Whether a *bottomry contract* in respect to a vessel navigating the lakes is a valid and binding contract, *quere*.

ERROR from the Supreme Court. *White* brought an action of *trover* against *Cole* and *Thurman* for the undivided half of a schooner called the *Deming*, her tackle, apparel and furniture, purchased by him on the 9th March, 1838, at a sheriff's sale by virtue of an execution issued on a judgment in favor of the Commercial Bank of Oswe-

**1841.**

Cole & Thurman
*v.*
White.

go, against *W. & C. Deming* and two other persons, dock-etted 16th October, 1837.   The property was levied upon by virtue of the execution on 21st October, 1837, at which time the Demings were in the possession of the vessel. The *Demings* resided at *Oswego*, and owned the one-half of the vessel, and Messrs. *Williams & Hollister*, of *Utica*, owned the other half.   The schooner was navigated on lakes Ontario and Erie from the 7th of August, 1837, until 24th December following, when she was laid up at Oswego.   The Demings run her for the joint account of the owners.   John Ripson sailed her as master.

On the 28th December, 1837, the schooner, her tackle, apparel and furniture were delivered by the *Demings* to *Thurman*, one of the defendants, under a *mortgage* executed to him and his partners, *A. & J. S. Weed*, by the *Demings* on 25th *August*, 1837, to secure the payment of the sum of $2,000, on the first day of *September* then next. The mortgage was filed in the town-clerk's office of Oswego on the third day after its date.   It was executed at *Oswego*, but at the time of its execution the vessel was not there, she having sailed from Oswego for Cleaveland in Ohio, on the 10th August, and did not return until the 2d September; between which last day and the 24th December she performed four voyages from and to Oswego. The plaintiff admitted that at the time of the execution of the mortgage the *Demings* were indebted to Thurman and A. & J. S. Weed, who resided at *Troy*, in the sum specified in the mortgage, and that it was given at their solicitation for the purpose of securing the debt due to them.   On 28th March, 1838, the vessel was sold by *Cole*, a deputy sheriff, by virtue of an execution issued on a judgment confessed by the *Demings* in favor of Messrs. Thurman and Weeds on 28th December, 1837, as collateral security for the debt due to them, and Thurman and Weeds became the purchasers; Thurman indemnifying the sheriff.   For this act the suit was brought.

The evidence being closed, the counsel for the defend-

dants insisted, 1. That the vessel not being in *port* at the time of the execution of the mortgage, this case is *within the exceptions* to § 5, as specified in § 7 of the title to the statutes respecting fraudulent conveyances; 2. That the plaintiff having notice of the mortgage, purchased merely the *right* of the *Demings*, and of course purchased subject to the mortgage; 3. That the mortgage having been made for an adequate consideration, in good faith, and without any intent to defraud, was a valid conveyance, and entitled to preference over the judgment of the Commercial Bank; 4. That the question of *fraudulent intent* was a question for the *jury* and not for the court; 5. That the circumstances of the case—the property mortgaged being undivided; arrangements having been made for running the vessel throughout the season, with which the mortgagees could not interfere; and the distance of their residence from Oswego, were sufficient reasons to account for possession not accompanying the conveyance; 6. That there was no legal *levy* under the execution of the Commercial Bank, and that this question should be submitted to the jury; and 7. That the *nominal* sum of *three dollars* was not a sufficient consideration to support the sale, and that the question should be submitted to the jury, whether, under the circumstances of the case, the sale was not fraudulent. The circuit judge thereupon delivered his *opinion:* that the case did not fall within the exceptions specified in the 7th § of the act concerning fraudulent conveyances; that the plaintiff, under his purchase, took all the interest of the Demings in the vessel which the plaintiffs in the execution had a right to sell; that under the rule adopted by the supreme court it was not enough to show a good consideration for the mortgage, but that a good reason for not delivering possession must be shewn, and that though the fraudulent intent is a question of fact, yet the reason for not delivering the possession of the property, though it consists of facts, must, on the authority of

**1841.**

Cole & Thurman
*v.*
White.

several cases, be facts which by the rules of law afford good reason for such non-delivery; and that in his opinion the facts shewn in this case did not upon those authorities furnish any such good reason for the non-delivery, not only before the forfeiture of the mortgage, but for a long time thereafter, even until the close of the season; that a creditor or purchaser looking at the mortgage on file, and seeing the time elapsed for the fulfilment of the condition and observing the property still in the possession and use of the *Demings*, might justly conclude that the debt was paid; that possession might have been taken by the agent of the defendants, at any time after the forfeiture when the vessel was in port; that the smallness of the sum bid by the plaintiff did not affect the validity of the sale, the agent of the defendants being present at the sale; that the *levy* was valid if made in the manner testified to by the deputy, but the facts in reference to the levy would be submitted to the jury, and that the only questions for the jury were whether a proper levy had been made, and if they should find in the affirmative, then as to the amount of damages to be awarded to the plaintiff. After the counsel for the parties had addressed the jury upon the questions designated by the judge to be submitted to them, the judge charged the jury, who found a verdict 'for the plaintiff for $1,750. The defendants, on a case made, applied to the supreme court for a new trial, which was denied. See the opinion delivered by Mr. Justice Cowen, 24 *Wendell*, 121 *et sequitur*. The case was thereupon turned into a bill of exceptions, and the cause removed into this court by writ of error sued out by the defendants. The case was argued here by

*S. Stevens*, for the plaintiffs in error.

*J. A. Spencer*, for the defendant in error.

After advisement the following opinions were delivered:

By *Senator* VERPLANCK. The first question to be settled here, is as to the legal character of the hypothecation under which the plaintiffs in error claim. It has been maintained to be an hypothecation within the exceptions of the *seventh section of title two,* of that part of the statutes entitled, " Of fraudulent conveyances and contracts relative to goods, chattels, and things in action;" and therefore not subject to the presumption of fraud imposed by the statute upon sales and assignments by way of mortgage, unaccompanied by delivery and continued change of possession. That section declares that such presumption shall not apply to contracts of bottomry or respondentia, or hypothecations of vessels or goods at sea, or in foreign ports.

A bottomry bond is a bond given for a loan of money, upon the security of a vessel and its accruing freight; its payment being dependent upon maritime risks, to be borne by the lender. The condition of the bond is the safety of the hypothecated vessel. The loan is on condition, that if the vessel hypothecated be lost by the perils of the sea, the lender shall not be repaid. It is for a specified voyage more ordinarily, but sometimes for a specific time; and as it substitutes the risk of the adventure to the unconditional responsibility of the borrower, the rate of interest is universally (though not of necessity,) such as would without that risk be usurious. The lender becomes to that amount an insurer. The forms of the bonds vary; they more commonly with us, I believe, specify the risks assumed, which resemble those of the insurer; but some of the older forms covenant merely that the bond is to become absolute, with a certain rate of interest, or with a specified premium, on the safe completion of the voyage, or the safety of the ship at the expiration of the specified term. 2 *Marsh. on Ins.* 633. 1 *Phillipps on Ins.* 300. The mortgage in this case has not a single one of these characteristics. It is not for a loan in any way contingent upon maritime risks, but is a positive security for an existing debt. No

*1841.*

Cole & Thurman
*v.*
White.

peril of navigation is insured against. The assignment becomes absolute, not upon any contingency of the safe termination of the risk, but upon the non-payment of the debt. The rate of interest is left to be governed by the general law of the land, without any stipulation for a bottomry premium or a nautical rate of interest, whilst the principal is not to be discharged by the loss of the vessel. This is, therefore, clearly not a bottomry contract, but an ordinary mortgage or hypothecation of the vessel of the same legal character with other mortgages of goods and chattels.

I must however, observe, that I very much doubt whether the contract of bottomry can be of necessity confined to *salt water navigation.* The contract has been recognized as valid upon reasons of great public utility, ever since commerce has taken its present character. Those reasons have no particular application to the *ocean* more than to the *lakes,* whilst neither the name or the fact of fresh or salt water need ever enter into the contract, nor do they appear in any positive law or judicial rule regulating its principles. As at present advised, I perceive no reason why there might not be a valid bottomry contract on a vessel navigating our lakes, just as well as a contract of marine insurance. I say this, however, merely in the way of protestation against its being considered that concurrence with Judge Cowen's opinion as to the legal character of this mortgage, comprehends also agreement with him in denial of the legality of a bottomry bond upon a like vessel; a question which I wish to leave unincumbered by any authority, which might be inferred from our present decision.

Neither is this an *hypothecation* in another and usual sense of the phrase, which is a bottomry mortgage of the vessel, made by the *master* in a case of necessity and without any personal responsibility. Nor can it properly be considered as an assignment or hypothecation (in the larger sense of the words,) " of a vessel at sea, or in a foreign

port." The word "sea" has received too strict and too frequent a definition in our common law, and in the admiralty courts as well as in the books and discussions of international jurisprudence, to permit its extension to our fresh water lakes in exact or technical usage. The policy of the law here, may perhaps, authorize the extension of the rule to our internal fresh water seas, but that is a matter resting within legislative discretion and not one for judicial enlargement. The acts of congress regulating commerce and navigation, and the cases and discussions, English and American, upon the extent and character of national sovereignty, and of admiralty jurisdiction, from *Coke* and *Hale*, down to the case of the *Thomas Jefferson*, 10 *Wheaton* 428, and other more recent cases in the circuit courts of the United States, all prove that the ebbing and flowing of the tide water, or immediate communication with the ocean, are essential to the legal character of a sea.

It would also require a very latitudinarian construction to enable us to understand the words " a foreign port," as extending to mean a port of another state, as of Ohio. The acts of congress regulating our navigation, as that of 1790, " For the government of seamen in the merchant service," use this phrase in its ordinary sense, as distinguished from the ports of another state than that in which the vessel is owned. The phraseology of our state enactments will also be found to distinguish between locality " in another state," and " in foreign countries." See, for example, 1 *R. S.* 714, in relation to insurances made within this state.

But whatever latitude we may give the phrase, the question cannot be said to be presented here, since there is no evidence that the vessel was, at the time of the execution of the mortgage, actually in the port of another state. The only evidence looking that way, is that she had cleared out for Cleveland above a fortnight before, but there is no evidence of her being there on the 25th or the 28th of August, and the probability, from the dates, is indeed that she

*1841.*

Cole & Thurman
*v.*
White.

was then on her return voyage. I accordingly concur fully with the supreme court, that the mortgage in question was strictly the case of an assignment by way of security, unaccompanied by an immediate delivery, and not followed by an actual and continued change of possession, as the vessel was left in the possession of the mortgagors, its half owners, for three months, until the levy was made under an execution by another creditor.

White, the defendant here, who purchased under the execution, is a subsequent purchaser with notice of an adverse claim; but he represents the rights of the Oswego Bank, a creditor, (probably among others,) of the mortgagors. Thus, this is precisely a case where the statute has said, that such " assignments by way of mortgage, shall be *presumed* to be fraudulent and void, and shall be *conclusive* evidence of fraud, unless it shall be made to appear on the part of the person claiming under such assignment, that it was made in good faith and without any intent to defraud." But it appeared that the schooner mortgaged, was at the time abroad on a voyage up the lake, so that the assignment could not have been accompanied by an immediate actual delivery, although possession might have been taken a few days later on her return, as well as at several other times before the levy. Does this circumstance operate to rebut the presumption of fraud, either by its legal effect, so as to take the case out of the statute, or as a fact furnishing a full refutation of the presumption of fraud ? I agree with Judge Cowen, that to allow the temporary impossibility of delivery to serve as a complete and permanent exemption from the requirements of the statute, when that impossibility ceased, would be in direct contrariety to its intent and policy, and would afford opportunity and cover for the very frauds the statute was designed to prevent. But there is no need, in my judgment, to resort to the probable or avowed object of the law to aid us in its interpretation. We have but to follow out its literal sense. Two different requirements are insisted upon in the

statute, and the defect of either raises a presumption of fraud, to be repelled only by positive proof of good faith, *Immediate delivery* must accompany the sale or assignment, and *actual and continued possession* must follow.   Proof of the impossibility of immediate delivery, could not alone make it appear that such an assignment was not made with a fraudulent intent, for there is nothing inconsistent with fraud in a sale or mortgage of chattels at a distance; but such proof, supported by evidence of change of possession when it became possible, or other evidence of adequate consideration and honest motives, would be proper and sufficient to repel the presumption of fraud.   Otherwise, the naked fact of impossibility of delivery for a time, cannot prove the good faith of the transaction, as the statute requires, whilst the want of actual possession when it became possible, is still conclusive evidence of fraud until the contrary is proved.   Thus here, supposing the want of immediate delivery of the schooner excused, so far, by her absence from the port, still the good faith and honest intent of the parties remain to be shewn; and the mortgage not having been followed by actual and continued possession, on and after the 2d day of September, when possession could have been taken, must still be presumed to be fraudulent and void, until its good faith can be made to appear by satisfactory evidence.   This plain interpretation of the words of the statute is so strictly in conformity with its spirit and intent, that it can gain little additional strength from authority founded on general legal principles.   It however, coincides with the rules applied by the courts from the time of *Hardwicke*, 2 *Vesey* 272, to the present day, to sales and mortgages of vessels and goods at sea.   It has always been held, that such transfers or mortgages by means of the appropriate documentary evidence, operated as a valid delivery, if afterwards followed by actual possession; " because," says Chancellor Kent, " it is all, the delivery that the circumstances of the case admit of, and it is giving to the buyer or the mortgagee the ability

1841.

Cole & Thurman
*v.*
White.

1841.

Cole & Thurman
v.
White.

to take actual possession, which he must do as soon as possible on the return of the ship." 3 *Kent's Comm.* 133. To the authorities cited by him, viz: 2 *Vesey* 272, 4 *Maule & Sel.* 242, *and* 9 *Pick.* 240, may be added *Hamilton* v. *Russel,* 1 *Cranch R.* 309, *and Conard* v. *Atlantic Ins. Co.* 1 *Peters' R.* 449, in the supreme court of the United States. These are strong authorities for the equity and wisdom of the rule; but my own mind is satisfied to rest upon the language of the statute. It is clear to me, that the presumption raised by want of possession, is not in any way affected by the impossibility of immediate delivery, but still remains to be rebutted as the statute requires. Accordingly, if the judge was correct in his opinion that "the facts shown did not furnish any good reason for the non-delivery of the property, not only before the mortgage was forfeited, but for a long time thereafter, and until the close of the season—that the possession might have been taken at any time after the forfeiture, when the vessel was. in port," &c., as well as in confining the consideration of the jury entirely to the questions of the fact of a valid levy, and of the amount of damages, excluding from their consideration the other evidence tending to show the good faith of the mortgage: then there is no reason for disturbing the verdict, which thus rests upon the uncontradicted presumption of fraud, arising from non-delivery and want of possession after the schooner's arrival in port, whatever might have been the opinion of the judge or jury on any other point.

If the proof of the absence of the schooner had been submitted to the jury to be passed upon as a valid legal defence (as the supreme court consider it to be) against the presumption of fraud, during the three or four days of that absence, still that would have been immaterial as to the verdict, so long as the legal presumption arising from the mortgage not being *followed* by *subsequent delivery* and *continued possession* would remain. "conclusive evidence of fraud," unless removed by the evidence of *good faith,*

which, Judge Cowen here says, the supreme court have
uniformly withheld from the jury " when the parties have
refused to change the possession, if change were within
their power." If the doctrine of the supreme court on this
point be correct, their decision was not erroneous in refus-
ing a new trial.

But this case presents directly the question of fraudu-
lent intent, which, by a provision of another title of the
same chapter, already cited, shall in all cases arising under
this chapter, be deemed a question of fact and not of law.
That question was then to be passed upon by the jury upon
the evidence of whatever facts might in their judgment
remove the presumption of fraud by clear manifestation of
good faith in the transaction. My reasons for considering
this not merely as the most probable interpretation of the
statute, but as the only one at all consistent with the use
of language or the intent of the legislature have been given
in the case of *Hoe* v. *Acker*, 23 *Wendell*, 653, and the con-
clusions there stated, if not the reasons assigned, have the
authority of this court.

The testimony to make such good faith appear in this
case, and to rebut the legal presumption that the mortgage
was fraudulent and void, went to show a valid considera-
tion, being a debt admitted to be due to the amount speci-
fied in the mortgage; the due filing of the mortgage; the
impossibility of an immediate delivery of the schooner by
reason of her not being then in port; the fact of a joint
ownership of the vessel by the mortgagors with others,
certain arrangements made as to the employment of her,
and other facts as to the residence of the owners, &c. less
material, all which counsel might have urged, and the jury
might have thought sufficient to have authorized an infer-
ence as to fair intent, and to have afforded good reason for
not taking possession when the schooner arrived. All these
facts were excluded from the consideration of the jury by
the judge, because, " in his opinion, the facts shown did
not, according to the authorities, furnish any good reason

for the non-delivery of the property not only before the mortgage was forfeited, but afterwards;" and he charged " that the only matter for the jury to pass upon except the question of damages, was, whether the facts sworn to in relation to the levy upon the vessel were substantially true." Under the statute as just cited, and the decision of this court in *Hoe* v. *Acker*, the exclusion of the testimony going to prove good faith from the consideration of the jury, the passing upon it by the court as not furnishing good reasons for non-delivery, and thus taking from the jury the whole question of intent, were erroneous and compel the granting of a new trial.

The admission or proof of a *bona fide* debt; the peculiar circumstances of ownership; the residence of the parties; the employment of the vessel, and similar matters, might or might not be satisfactory evidence to the jury of the entire good faith of the transaction. There may possibly be circumstances in the case from which some inference might be drawn of actual intent to delay or hinder creditors, or to obtain an unfair preference; still there was such affirmative testimony to facts, generally accompanying and tending to indicate good faith as raised a question of fair or fraudulent intent to be passed upon; and the statute expressly gives the right of passing upon such a question to the legal judges of all disputed facts, the jury.

Having upon two former occasions in this court, viz: in the cases of *Stoddard* v. *Butler*, 20 *Wendell*, 545, and *Hoe* v. *Acker*, 23 *Id.* 653, stated my views of the intent, and policy and meaning of the language of the legislature in their enactments on this long contested subject of sales and mortgages of goods and chattels, unaccompanied by possession, I might close this opinion by saying, that the present decision of the supreme court being in contradiction to the decision of this court in *Hoe* v. *Acker*, ought to be reversed; but as the learned judge, who delivered the opinion of the court in this case has taken the occasion to defend the general doctrine of his court on this head, and

1841.

Cole & Thurman
v.
White.

has stated more explicitly than heretofore some of the grounds upon which that doctrine rests, some further examination of the question will be justified by the great importance of the subject to all the business concerns of this state, and by its close connection with principles of statutory interpretation and of constitutional right. It is also due to the high character of the court from whom so many of the present and former members of this court have differed on this question; and especially to the frank and candid spirit of discussion and statement of principles which characterise the opinion of Judge Cowen.

The controlling argument, running through the reasoning and decisions of the supreme court, is the danger of false credit and fraudulent evasion of debt whenever delivery and change of possession do not accompany and follow change of property, whether absolute or qualified. The long experience of the learned judge has furnished apt illustrations of this danger, and of the modes in which such frauds can be effected. Their truth cannot be denied. Yet this is but one, and that the narrowest side of the question; whilst it is also that view of the matter which is most frequently, indeed, almost exclusively, presented to the examination of courts. But when we look at the daily business of life, out of court, another aspect of this question presents itself: Mortgages of personal property, as ships, lake-vessels, canal-boats and river craft; the stock and implements of the mechanic or small manufacturer; the furniture of the inn-keeper; assignments for the benefit of creditors, leaving the goods and debts assigned, publicly to be managed and disposed of by the original owner as an agent, best acquainted with the business and acting for the benefit of creditors who have full confidence in his integrity—all these have grown out of the usages of modern society; the necessities of commerce; the conveniences of daily life; the wants and usages of trade and industry. They have followed in the train of commerce, credit and enterprise. Like them, they have been largely pro-

ductive of benefits to society; yet those benefits, like the results of all other human action, are not unmixed with evil. By such means the adventure, capacity, acquirements and industry of the young or the needy have been aided and stimulated; large concerns of honorable but unfortunate merchants have been settled to the greatest advantage of the creditors and the least possible loss of the insolvent; and the kindness of parents or the generosity of friends, has been enabled to preserve the comforts of a home to the wife and children of a bankrupt, without the slightest injury or fraud (save in legal fiction) to prior creditors or subsequent purchasers. Society reaps nothing but unquestioned benefit from nine-tenths of such assignments or securities occurring in actual life. The other tenth may come before the courts, and a majority of those impeached may, possibly, deserve to be set aside. It is not then at all surprising that this different experience should give a different character to the whole in different minds. It is thus as to all the operations of commerce beyond mere cash buying and selling and barter.

I have seen in recent literary journals of reputation, ingenious arguments against the use of insurance as tending to conspiracy, barratry, wanton sacrifice of life at sea, and arson on shore. If we were to judge only from the evidence appearing in trials at Guildhall or the New-York circuit, we might be led to consider this business as pregnant with moral guilt and public evil, and deserving to be frowned down by the courts, if not prohibited by statute. Yet who does not know that there are every day some thousands of honorable and prudent contracts of insurance that never attract any notice beyond the parties; that the farmer or the mechanic thus finds security for the acquisitions of his industry against the ravages of fire, which his own prudence could not prevent. Thus, too, when the merchant, alarmed at the rumors of wars or the perils of unknown seas, doubts and hesitates, the underwriter, (if I may use the language of the great legislators of the Napo-

leon code, glowing with the eloquence of truth,) after sub-
jecting to calculation the perils of the ocean, the dangers
of climate, the chances of war and peace, thus boldly ad-
dresses the navigator: " You, like other men are subject to
disasters; so far as these may affect your person we can
only offer you sympathy.   But as to your pecuniary inte-
rests, go, traverse the ocean, exert your skill and enter-
prise.   We guaranty you against the risk of loss."  *Mo-
tives du Code de Commerce, liv.* 2, *tit.* 9.

Our revising legislature, in re-moulding and improving
the old legislation of the statute of frauds, have, in their
enactments, (as they were understood by this court in *Hoe
v. Acker,*) endeavored to guard against the abuses of as-
signments unaccompanied by ·change of possession, and
yet to preserve the manifold uses and benefits of such
transactions whenever they were admitted to be honest, or
could be proved to be so, by such positive evidence as would
satisfy a jury.   But the dread of deceit and trick, has led
our supreme court, (or a majority of them,) in the inter-
pretation of the statute, to ask, (in Judge Cowen's lan-
guage,) " was it intended that colorable excuses should be
submitted to the jury as evidentiary of *bona fides,* under
the guidance of arbitrary judicial discretion ?"   To this,
and similar questions on the legislative intent, he replies:
" We have hitherto given one uniform answer to this inqui-
ry.   We have withholden the question of *bona fides* from
the jury, where the parties have refused to change the pos-
session, if change were within their power.   We have con-
sidered delivery as the form put forward by the statute, to
test the honesty of the transaction; and that the allowance
of one evasive excuse after another, is but submitting to
have the courts and juries imposed upon by pretences rea-
dily devised and eagerly raised."  " The statute," he adds,
" calls for a ceremony of little trouble, in . order to fulfil
the purpose—change the possession."  To this, the answer
is obvious.  Change of possession is not made in many
honest and even meritorious transactions of this sort, be-

1841.

Cole & Thur-
man
*v.*
White.

1841.

Cole & Thurman

*v.*

White.

cause it would often defeat the object of the assignment or mortgage. The law of the land no where expressly demands it. Goods ordinarily pass by delivery, and they cannot be *pledged* without it; but our common law never made it essential to a *change of property,* 2 *Black. Comm.* 448. 2 *Kent's Comm.* 492. *Lord Ellenborough, in* 7 *East.* 571; or to the validity of a mortgage, unless so far as the want of it might furnish evidence of fraud in the transaction. Our own statutes, in requiring mortgages not accompanied by possession to be filed in a public office, and in providing for the possibility that it may be " made to appear that they were made in good faith," are conclusive authority that they may be valid in some cases without change of possession. The distinction between a *mortgage* of goods, to which delivery is not absolutely essential, and a *pledge,* where the lien depends wholly upon possession, has been repeatedly recognized in this, as well as in the supreme court. Whence then, does any court derive authority to abolish that distinction, and to enact that there can be no valid mortgage of moveables, however public or honest, without actual delivery to the mortgagee, when actual delivery is within human possibility ? The old Roman law did absolutely forbid the hypothecation of moveables, except as delivered pledges. So, too, it made delivery essential to the effect of a sale. But in the countries where the civil law now forms the basis of the local jurisprudence, it has been found necessary to modify these rules in respect to *sales, Code Civ.* 1583, and by specific exceptions, as of ships and stock, in regard to *hypothecations;* but our common law never held this theory of sales or mortgages, nor applied it at all, as between the parties. Great authorities, however, have decided that a sale or assignment without change of possession, was in itself a fraud, and therefore void; others have pronounced this to be conclusive evidence of fraud, not to be refuted or explained, and the transaction therefore fraudulent. The same principle has been applied to mortgages, although

they do not stand on precisely the same ground with sales. On the other hand, the greatest names in law and equity, as Chief Justice Holt and Lord Eldon, have decided that unchanged possession of chattels in such cases, was only *prima facie* evidence of fraud, capable of refutation, and have held that a bill of sale of goods might be taken as a security for a loan of money, and the goods fairly and safely left with the debtor. 1 *Ld. Raymond* 724. 2 *Bos. & Pul.* 59. 10 *Vesey Jr.* 145. Courts in England and America have fluctuated between these two doctrines, but these decisions are no longer binding upon us, since our own statutes have prescribed the rule which we have only to interpret and to obey. Our statute, adopting more nearly than any other the doctrine of Lord Eldon, but laying it down in stronger language, contents itself with raising a presumption of fraud, which it declares conclusive unless positively refuted. Thus it removes the chief difficulty in the way of setting aside secret and fraudulent trusts, by relieving the jury from the necessity of implying any actual guilt by their verdict, a conclusion, which, (in the words of Chancellor Kent,) " it is so difficult to ascertain, and frequently so painful to infer." On the other hand, it expressly rejects the doctrine that such want of delivery is either positive fraud in itself, or the conclusive proof of it beyond the power of evidence to remove, by providing that the presumption shall not apply when the good faith of the transaction can be made manifest. This question of intent is then made a question of fact; thus again rejecting or repealing the rule of decision in the various adjudications which have followed the authority of *Edwards* v. *Harben*, and adopting that applied by Lord Eldon, in *Kidd* v. *Rawlinson*, 2 *Bos. & Pul.* 59, and by other later cases, as *Leonard* v. *Baker*, 1 *Maule & Sel.* 251.

But it is now maintained that this statutory amendment or declaration of the law, whichever it may be, does not abrogate the authority of the court over the admission or exclusion of evidence. " The parties to a suit are not

1841.

Cole & Thurman
*v.*
White.

1841.

Cole & Thurman
v.
White.

permitted to adduce every description of evidence, which, according to *their own notions,* may be supposed to elucidate the matter in dispute. It is the province of the *judge* to decide all questions on the admissibility of evidence." From this rule, as expressed in Judge Cowen's quotation from Phillipps on Evidence, he infers: " The whole then, comes down to the question what evidence is admissible." " Need I say," he adds, " that if the facts proposed in proof as an answer to the presumption, amount to nothing, they are not admissible: in other words, they are incompetent, and as such the judge is bound to exclude them, or tell the jury that they amount to nothing." Unquestionably, the power of the judge over the evidence is not abrogated; but neither is it increased. The acknowledged right to reject incompetent evidence, does not imply the right to exclude proof of such facts as by the ordinary laws of evidence and the common understanding of men, go to prove honest intent, or to disprove deceit and collusion, merely because such facts may possibly be " false or fabricated, or tainted with perjury," or because, in the view of the court, such evidence is not absolutely and in all cases demonstrative proof. It does not authorize the court to create a general rule of policy, declaring that certain facts, which are not always of necessity incompatible with collusion, shall never in any case be received as proof of good faith. This is in effect to repeal that part of the statute which declares that the question of intent shall be deemed one of fact, and to make it wholly a question of law.

The authority of the judge in admitting or excluding evidence, generally remains as it was before the statute. That is well defined by usage and decision, as to this very question of *fraudulent intent.* The right of a jury to judge of fraudulent intent is not new. On other questions of fraud, it has long been admitted without contest. Thus where the ground of the action is the intent to deceive : " Of this," says Starkie, summing up the rule of *Tapp* v. *Lee,* 3 *Bos. & Pul.* 363, and *Pasley* v. *Freeman,* 3 *T. R.*

51, and in all other questions of *mala fides*, the jury are to judge." 2 *Starkie's Ev.* 470. So they are admitted to be the judges not only of the intent to deceive, but of the *scienter*, the concealed knowledge, which often amounts to the same thing. So they are judges of constructive fraud, in commercial and insurance contracts; of suppression or omission of material facts, and of the materiality of those facts. Now, in almost all such cases the *scienter*, the knowledge of the party, his intent to deceive or mislead, are moral or intellectual facts to be inferred by the jury, from such external facts and circumstances as in the ordinary course of life, would satisfy men of sound judgment. The courts have never presumed to lay down any arbitrary rule, requiring some specific sort of evidence, conclusive to the point, and excluding all other testimony. Whatever fact can give probable indication of the moral fact to be ascertained, is relevant, and must go to the jury, unless excluded by some general law of evidence. Of its weight the jury are the judges, and it is only in the case of a clearly erroneous verdict against evidence, that the court interferes to grant a new trial. Let me state an example or two:—In the numerous cases which have arisen of late years upon fraudulent recommendations for commercial or other credit, it has always been held that the direct intent to defraud as well as that equally mischievous indirect guilt, inferred from knowledge of the falsehood of the assertion, are both facts to be ascertained by the jury from other facts or circumstances, giving more or less probable indication of such design or knowledge. Thus in *Tapp* v. *Lee*, 3 *Bos. & Pul.* 271, it was held, " The jury were not misdirected as to the point of law. The fact left to the jury was the fraud. Circumstances certainly afforded evidence of fraud. To decide upon that evidence was the peculiar province of the jury." Again, in *Eyre* v. *Durnford*, 1 *East*. 318. The jury were satisfied that the representation was false, and there was sufficient evidence to warrant them to believe the representation was also fraud-

1841.

Cole & Thurman
v.
White.

ulently made. In *Ward* v. *Center*, 3 *Johns. R.* 271, in our own supreme court, it was held that "whether there was fraud or not, was a question of fact for the jury to decide, and when there was evidence on both sides, the court would not set aside a verdict, though dissatisfied with it." I cite these cases not as necessary to prove the jury's right to judge of such questions of fraud, but to show the manner and spirit in which that doctrine was held and applied, in cases where the court indicated an opinion that the jury might have given too much weight to some part of the evidence. Thus in the last case cited, Judge Van Ness, in delivering the opinion of the court, said: "I never should have given such a verdict as the jury have found here. But notwithstanding I am not prepared to say that there is no evidence upon which the jury might find the fraud. The question of fraud has been fairly submitted to them, and they have found against the defendant. They had a right to do so, though I may wish they had done otherwise." So again on the inferential fraud of concealment in a contract of insurance. "The question," said Chief Justice Gibbs, "is, did the plaintiff know any fact injurious to the adventure which ought, *in common honesty*, to have been communicated. If the concealment be of a material fact, whether of a rumor, a report, &c. it ought to be communicated. It is the province of a jury to decide what facts ought to be communicated." *Dudley* v. *Baderly*, 1 *Holt R.* 283. The same rule was laid down in a masterly opinion of Chancellor Kent in this court, and supported by a majority of this body, in *New-York Firemen's Insurance Company* v. *Walden*, 12 *Johns. R.* 513, a case to which I must again refer for another purpose.

There is yet another class of cases upon the question of fraudulent intent, which bears directly and immediately upon this very point, of the nature and character of the evidence admissible to prove or disprove intent, when that question is submitted to a jury: I mean those numerous cases in the Eng-

lish courts and in those of some of our own states, as Massachusetts, New-Hampshire, Maine and North Carolina, which have followed the lead of Lord Eldon, and held that the presumption of fraud operated only as matter of evidence and did not exclude the party from being let in to prove his fair dealing and innocent intent. These cases as already admitted, are not with us, since our statute, any more authoritative upon the primary and leading question, than those which have followed the more severe doctrine of Buller, in *Edwards* v. *Harben;* but when once it is admitted that the question of intent may go to the jury at all, after the presumption of fraud is once raised, and that they can pass upon the intent of the transaction, on some sort of evidence or other, then surely the judgment of Eldon, Dallas, Gibbs, Abbott, and the courts over which they presided, as well as that of the learned and able bench of Massachusetts, and of those of other respectable state courts, must be of the highest authority, even under our statute, as to the point of the competency, relevancy, admissibility and nature of the evidence from which the jury may be allowed to infer intent. Now in those cases generally, where the question of intent was left to the jury, the facts of a valid and adequate consideration (not as in itself conclusive, but as a necessary part of the evidence,) the notoriety of the transaction; its attendant circumstances, the inconveniences (not the impossibility,) of removal of the articles assigned, the relation of the parties: in short, all those facts indicating fair intent, which, under the decision of our supreme court, have been pronounced " not admissible; in other words, incompetent;" were considered by the courts at Westminster Hall, Boston and elsewhere, as proper to go to the jury as the usual and necessary materials for their judgment as to intent and motive. 2 *Bos. & Pul.* 59. 4 *Taunt.* 823. 5 *Id.* 512. 8 *Id.* 676, 818. 1 *Brod. & Bing.* 506. 4 *Barn. & Cres.* 652. 15 *Mass. R.* 244. 1 *Pick.* 288. 7 *Id.* 56. 8 *Id.* 445. 10 *Id.* 199. 2 *New-Hamp. R.* 13, *cum mults aliis.* It must

1841.

Cole & Thurman
*v.*
White.

1841.

Cole & Thurman
v.
White.

be so upon the principle and reason of the thing. In every question of the *fact* of fraudulent intent, fraudulent recommendation, fraudulent or negligent concealment, or actual deceit, the intent or the knowledge is to be inferred from external facts or circumstances. " Fraud," said Lord Hardwicke, " may be made out like crime from circumstantial testimony." If *fraud* may be so proved in civil cases, why should *good faith* be subjected to more arbitrary rules ? But in relation to the evidence of circumstances and their effect as to proving intent, I can no where find the rule more distinctly stated than in one of the notes of *Cowen & Hill*, to their edition of *Phillipps' Law of Evidence, p.* 1309, where the opinions and language of the best preceding writers and decisions are well summed up. " What circumstances will amount to proof, can never be matter of general definition. The legal test is, *the sufficiency of the evidence to satisfy the understanding and the conscience of the jury.* Absolute metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient, if they produce moral certainty to the exclusion of reasonable doubt."

If collateral facts and circumstances may prove intent, good or bad, how far may the court regulate or control such evidence ? The spirit and principle which should govern courts in the exercise of their authority over evidence, have been clearly defined by the supreme court of the United States, when illustrated by the presence of Marshall and of Washington, in the case memorable in our state annals as that of the *Astor claim.* " Whatever evidence is offered to the jury, which is in its nature *prima facie* or presumptive, its character ought not to be disregarded, and no court has a right to disregard it or to view it under a different aspect from that in which it is actually presented. Whatever just inference it may draw from that character, the jury have a right to give it, and in regard to the order in which they shall weight it, the law

has submitted it to them to decide for themselves, and any interference with this right would be an invasion of their privilege to respond to the question of fact." *Crane* v. *Astor*, 6 *Peters' R.* 621. All facts or circumstances which to the common "understanding and conscience" of men might prove, or on their face tend to prove, good faith, are accordingly within the rightful privilege of the jury to hear and weigh in such cases. All facts, of which actual and adequate consideration must of necessity be always one, such as commonly accompany and indicate good faith, ought to be permitted to go to them. But this may lead to an erroneous verdict. " Such evidence," to use Judge Cowen's words, " may be· colored by glosses, warped by chicanery, perhaps tainted by perjury." Be it so. This is a result of the unavoidable imperfection of human testimony and human reason, and we must reply with the learned and experienced author of the note to *Cowen & Hill's edition of Phillipps on Evidence, p.* 387: " Is a witness to be discredited because he may be perjured or may be deceived ? Is an hypothesis to be rejected because it may be untrue ? The principle of veracity, the tenacity of memory, the skill of professional witnesses, the usual connection between circumstances and hypotheses, the sagacity of jurors, the wisdom of judicial caution, may each in turn be wanting; yet they must be taken·to be, as in·truth they are, perfectly adequate to the general administration of justice." All such proof of facts or circumstances is undeniably subject to the general rules of the law of evidence. Hearsay evidence is to be excluded, in such cases, because that is the general rule of our law. Proof of character is not to be received in cases under the statute, because it is excluded in all other suits where general character is not directly brought in issue. The competency of witnesses on the score of interest or otherwise, is to be judged of by the court as in any other case, and matter totally irrelevant to the subject is to be rejected. But the court has not therefore any right to establish

a positive legal rule, excluding evidence " tending to satis-
fy the understanding or the conscience of the jury " upon
the ground that similar evidence is sometimes fabricated,
or is not by itself conclusive in its effect. To admit this,
is to take from the jury the right to pass upon any doubt-
ful or contradictory evidence. It is in effect to alter the
statute, (I cannot say to amend it,) and to make the ques-
tion of fraudulent intent one of law and not of fact.

The statute declares that the question of intent shall be
deemed one of fact, and ordains that upon every claim of
property or lien under sale or mortgage of goods and chat-
tels not accompanied by change of possession, that ques-
tion of intent shall be raised by the presumption of fraud
in the transaction, unless its good faith can be made mani-
fest. But the court lays down the rule, that the question
of intent shall not be raised as a doubtful question of fact,
except in those few cases where change of possession is im-
possible, of which fact of impossibility the court, and not
the jury, must be satisfied. In the statute book we read,
that every sale or assignment of goods and chattels with-
out change of possession shall be presumed fraudulent and
void, " unless it shall be made to appear that the same was
made in good faith and without intent to defraud." But
the *decisions* under review would require the statute to be
read thus: " unless it shall be made to appear to the satis-
faction of the court that such delivery or change of posses-
sion was impossible." Are these two readings synony-
mous and equivalent? To my understanding, the latter is
not only substituting a different and secondary question for
the primary one of good faith assigned by law to the deci-
sion of the jury, but it even selects for that purpose a cir-
cumstance which is no certain criterion of intent; since
there may not only be honorable assignments without
change of possession, but there may also be fraudulent and
collusive sales or mortgages, where delivery is impossible.
All this seems to me in contradiction to the spirit and ex-
press *decisions* of our law of evidence. Indeed, we may

justly apply to this subject the striking remark of Chan- **1841.**
cellor (then judge) Kent as a member of this court, in re-
spect to the law of libel: " The distribution of power by Cole & Thur-
which the court and jury mutually assist and check each man
other, seems to be the safest and consequently the wisest. White.
The constructions of judges on the intention of the party
may often (with the most upright motives) be too specula-
tive and refined, and not altogether just in their applica-
tion to every case. Their rules may have too technical a
cast and become, in operation, too severe and oppressive.
To judge accurately of motives and intentions does not
require a master's skill in the science of the law. It de-
pends more upon the knowledge of the passions and of the
springs of human action, and may be the lot of ordinary
experience and sagacity." *The People v. Croswell*, 3
*Johns. Cases*, 376.

We have seen, that in many cases involving questions of
fraud, the number of which it would be easy to enlarge,
the right of the jury to decide upon the effect of evidence
unshackled by any technical rule of exclusion, except such
as results from the general law of evidence, has been
held sacred. Whenever the evidence could possibly sup-
port a verdict, it was left undisturbed. It was only in ex-
treme cases of manifest and undeniable finding against evi-
dence—not merely against what seemed to the court the
preponderating weight between opposite and doubtful evi-
dence—that those courts have thought themselves author-
ized to interfere. They then exerted their authority only
by sending back the cause to be re-examined by a second
jury, on the same or additional testimony; not by directing
an exclusion of insufficient evidence.

The right of juries to judge exclusively of the materiality
of facts offered in proof, according to the general rules of
evidence, has never been more clearly or forcibly asserted
than in the case of the *N. Y. Firemen's Ins. Co.* v. *Walden*,
decided in this court, 12 *Johns. R.* 513. The judge had
charged that the several matters given in evidence were

**1841.**

Cole & Thurman
*v.*
White.

conclusive of the barratry of the master; that the insured were not bound to communicate any matters in their possession touching the master; and that the matters given in evidence on the part of the defendants, were not sufficient to maintain the issue on their part, or to bar the action. Such a direction as to the insufficiency of the proof and the immateriality of the facts not disclosed, is far short of a total exclusion of such testimony from the jury's consideration. The supreme court had sustained this direction, but their decision was reversed in this court upon an opinion delivered by Chancellor Kent. " It was a well settled principle," he said, " that what facts within the knowledge of the assured are material to be communicated, is for a jury to determine. Whenever the judge delivers his opinion to the jury on a matter of fact, it shall be delivered as a mere opinion and not as direction, and the jury shall be left to understand clearly that they are to decide the fact upon their own views of the evidence, and that the judge interposes his opinion only to aid them, in cases of difficulty, or to inspire them with confidence in cases of doubt. It is for this principle that I feel solicitous. The case before us is of trifling importance, but the distinction I have suggested goes to the very root and essence of the trial by jury, and may become of inestimable value and perhaps of perilous struggle when the present generation shall have ceased to exist. I am disposed to hand to posterity the institution of juries as perfect in all respects as we now enjoy it, for I believe it may, in times hereafter, be found to be no inconsiderable security against the systematic influence and tyranny of party spirit." It is the spirit and principle, not merely the direct authority, of this decision of our predecessors in this court, that I am anxious to apply to the present question and all similar ones. I cannot forbear adding, that among the many eminent public services and titles to lasting legal and literary honors of the venerable and distinguished jurist whose impressive language has just been cited, his uniform and zealous guar-

1841.

Cole & Thurman
v.
White.

dianship of the trial by jury, from the period of the great *Croswell case*, in 1804, to the last hour of his judicial life, is conspicuous and remarkable. Eminent above his co- temporaries for profound and extensive legal science, bring- ing to the consideration of every important point, at once the black letter lore of our ancient common law and the varied range of its subsequent changes, together with the legal reason of the Roman code, down to the application of its doctrines by the great continental jurists of our own days—with all this rich store of scholarship and legal sci- ence, he, above all our judges, was the foremost to confess that there was still something that books cannot teach— that the knowledge of the motives and springs of human action can be gained from every day experience, better than from judicial rules—and that such rules are constantly liable to become harsh, technical, severe and oppressive, without the correcting aid of the every day experience of men, and life, found in the jury-box.

On questions of intent, a jury may sometimes be misled, but an occasional error is better than the harsh operation of a theoretical rule, permitting no distinction between collusive agreements and such sales or assignments as El- don and Abbott, (no inexperienced or lenient judges of fraud,) could pronounce to be made for useful and honest purposes. " In human institutions, the question is not whether every evil contingency can be avoided, but what arrangements will be productive of the least inconvenience."

It is with no small satisfaction that I am enabled to add, that experience has already confirmed the wisdom of the application of this doctrine to the subject before us. I learn from the best sources, that since our decision in *Hoe* v. *Acker*, its rules and principles have been repeatedly and uniformly applied by the circuit and superior court in the city of New-York, where the unfortunate circumstances of the times have of late rendered assignments and mortga- ges of goods and furniture unusually frequent. The verdicts have uniformly shown a strong leaning of the jurors against

claims of property unaccompanied by possession, giving the due weight to the statutory presumption of fraud, and suffering it to be removed only by exceedingly strong and clear proof of good faith and honest intent.

When this cause was argued, a fortnight ago, a number of the members of the court appeared ready to decide it at once, upon the principles and authority of our last years' decision. (*Hoe* v. *Acker*.) The decision was postponed at the instance of some of our colleagues, for the purpose of having their views and opinions on this subject (which it was understood had been questioned elsewhere,) formally and deliberately stated. I have endeavored to embody and defend those opinions in the pages just read. We have considered the right settling of the rule of decision under this title of our Revised Statutes, as a subject of the greatest interest and importance. Indeed, I think that it is so, beyond any other which has come before us during my term of office. It involves matters of the most intense interest, and universal application as to trade and enterprise. It regulates decisions upon important rights of property, frequently implicating with them (what is more precious than property,) character, honor, reputation. More than that—it involves the question, how far the representative public will, speaking through the statute book, is to be effectual against artificial interpretation—whether courts may not only declare what the law is, but may read it, as in their judgment it ought to be. Still more—it essentially affects the rights and duties of jurors, which, broken down in one class of cases, will be less and less regarded, until that chief safeguard of public liberty and private security may become no more than a form, a ceremony, a decent conformity to old usages and constitutional provisions, without power and therefore without value.

In my judgment, this decision under review ought to be reversed, because testimony relevant in itself, as tending to shew that the mortgage was made in good faith and without any intent to defraud creditors or purchasers, was on a

question of the fact of fraudulent intent, arising under Chap. 7, Part 2, *of the Revised Statutes*, excluded from the consideration of the jury, whose right it was to pass upon its weight and sufficiency.

The CHANCELLOR expressed his regret as to the state of the law upon this subject. He observed that since the determination of this court, in the case of *Smith and Hoe* v. *Acker*, 23 *Wendell* 653, two of the judges of the supreme court, in a case lately decided by them, (referring, it is supposed, to the case of *Butler and Barker* v. *Van Wyck*, 1 *Hill* 438,) had acquiesced in the construction given by this court to the statute, and had rendered a judgment accordingly; but that from the opinion delivered upon that occasion, by one of those judges, it would seem that he understood this court to have held the doctrine, that if there be evidence that a mortgage of chattels was given for a true debt, the question of fraud as to creditors arising from continued possession in the mortgagor, must be submitted to the *jury*, upon such evidence as the party may choose to adduce, whether relevant or not; the *court* having no longer the power to decide upon the usual *indicia* of fraud, or to interfere with the finding of the jury, be their verdict what it may. Whilst another of the judges of that court denies that the decision of this court in *Smith and Hoe* v. *Acker*, is conclusive as a precedent, he admits it may be final upon the parties then before the court, but insists that it does not conclude other parties having rights depending on the same question.

In respect to the case now before the court, the Chancellor adverted to the facts of the case, viz: the absence of the vessel from port at the time of the execution of the mortgage, and the consequent impossibility of an actual delivery at the time; the joint ownership of the vessel by the mortgagors and third persons, and that the vessel was in the care of a master navigating her for the joint account of the owners, thus preventing the deli-

very of an exclusive possession; and the admission of the plaintiff, that the mortgagors were indebted to the mortgagees in the sum specified in the mortgage, and that the mortgage was executed to secure such debt, and concluded by expressing the opinion that the evidence adduced by the defendants below, to repel the presumption of fraud arising from the want of a change of possession, was amply sufficient to require the judge to submit it to the consideration of the jury, and that, it having been excluded from their consideration, there should be a new trial; and that therefore the judgment of the supreme court ought to be reversed.

On the question being put, *Shall this judgment be reversed?* all the members of the court present at the argument of the cause, except *Senators* DENNISTON, HUNTER, and PAIGE, voted in the *affirmative;* the three named members voted in the *negative.* Whereupon the judgment of the supreme court was REVERSED.